# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF MARYLAND

JEFFREY SHORE                                    *
2613 Georgetown Road
Baltimore, MD 21230                              *          COMPLAINT AND

DONNA CURRY                                      *          DEMAND FOR JURY TRIAL
2613 Georgetown Road
Baltimore, MD 21230                              *          FOR MONETARY DAMAGES

      Plaintiffs                             *          FOR VIOLATION OF

V.                                               *          PLAINTIFFS' CIVIL RIGHTS

MAYOR AND CITY COUNCIL                           *
   OF BALTIMORE CITY
100 North Holliday Street                        *
Baltimore, Maryland 21202
County:  Baltimore City, MD                      *

THE BALTIMORE POLICE DEPARTMENT                  *
601 E. Fayette Street
Baltimore, Maryland 21202                        *
County:  Baltimore City, MD
                                                 *
JEMELL RAYAM
Federal Bureau of Prisons                        *

MOMODU BONDEVEA KENTON GONDO                     *
Federal Correctional Institute Butner Low
Old NC HWY 75                                    *
Butner, NC 27509
                                                 *
THOMAS ALLERS
Federal Correctional Institute Coleman Low       *
846 NE 54th Terrace
Sumterville, FL 33521                            *

MAJOR IAN DOMBROWSKI                             *
1913 Linden Avenue
Baltimore, Maryland 21217                        *


DEP. POLICE COMM. DEAN PALMERE                   *
1323 Crofton Drive, Lot 22

Bel Air, Maryland 21014                                 *

JOHN DOES 1-5                                           *
Unknown Supervisory Officers
c/o Baltimore Police Department                         *
601 E. Fayette Street
Baltimore, Maryland 21202                               *
County:  Baltimore City, MD
                                                       *

JOHN DOES 6-10                                          *
Unknown Police Officers
c/o Baltimore Police Department                         *
601 E. Fayette Street
Baltimore, Maryland 21202                               *
County:  Baltimore City, MD                             *

                    Defendants                          *
                                                       *
*      *      *      *      *      *      *      *      *      *      *      *      *

## COMPLAINT AND DEMAND FOR JURY TRIAL

Jeffrey Shore and Donna Curry, by their undersigned counsel, hereby file this federal

civil rights lawsuit, and state the following:

## INTRODUCTION

1.      Plaintiffs Jeffrey Shore and Donna Curry were the victims of a home invasion robbery on

or about June 27, 2014. Unknown to them at the time, the robbery was orchestrated by Jemell

Rayam, a former Baltimore Police Officer and member of a specialized police unit known as the

Gun Trace Task Force (*hereinafter* "GTTF"). The home invasion robbery was carried out two

civilians (non-police officers), who, acting at the direction of and in concert with Rayam, entered

the Plaintiffs residence dressed as police officers and with weapons drawn in order to steal

$20,000.00 from the Plaintiffs. Rayam's conduct in orchestrating the home invasion robbery and,

unbeknownst to the Plaintiffs at the time, participation as a "lookout" while sitting in his

personal vehicle near the scene, was a gross violation of the Plaintiffs' civil rights.

2.      This is a civil rights action for monetary damages for violation of Plaintiffs' rights as secured by the United States Constitution, the laws of the United States, the Maryland Declaration of Rights and the laws of the State of Maryland against the Mayor and City Council of Baltimore (*hereinafter* "MCC"), the Baltimore Police Department (*hereinafter* "BPD"), Former Baltimore Police Officer Jemell Rayam (*hereinafter* "Rayam"), Former Baltimore Police Officer Momodu Bondeva Kenton Gondo (*hereinafter* "Gondo"), Former Baltimore Police Sergeant Thomas Allers (*hereinafter* "Allers"), Major Ian Dombrowski (*hereinafter* "Dombrowski"), Deputy Police Commissioner Dean Palmere (*hereinafter* "Palmere"), John Does 1-5 (other unknown supervisors within the Baltimore Police Department, and John Does 6-10 (unknown police officers of the Baltimore Police Department).

3.      The Plaintiffs allege that Defendant Rayam, in coordination with other individuals and other Unknown Police Officers, among other things, unlawfully, improperly, unconstitutionally and without a warrant or probable cause stopped, detained, searched and seized the Plaintiffs, and/or conspired to do so, and unlawfully, improperly, unconstitutionally and without a warrant or probable cause searched, (and/or caused to be searched) the Plaintiffs' residence and seized (and/or caused to be seized) items and money therein.

4.      The Plaintiffs allege that the BPD, the MCC, Allers, Dombrowski, Palmere and/or other Unknown Supervisors are liable for Rayam's conduct because, as set forth more fully *infra*, they acquiesced in, tolerated and permitted a pattern and practice of unlawful, improper, and unconstitutional stops, detentions, searches and seizures; failed to properly investigate such incidents and discipline the officers involved; failed to correct the unconstitutional actions of Rayam and the other GTTF officers; created the GTTF unit despite prior knowledge that such specialized units in past have result in similar civil rights violations; selected Rayam to be a

member of the GTTF despite knowing that Rayam had serious integrity and honesty problems and prior instances of misconduct; permitted Rayam to remain a member of the GTTF despite knowing that Rayam had serious integrity and honesty problems and prior instances of misconduct; failed to properly and adequately supervise the officers involved; and otherwise engaged in, or failed to engage in, other supervisory conduct that would have deterred and/or prevented the wrongful, improper, unconstitutional and illegal conduct of Rayam. As a result, Rayam and the other police officers belonging to the GTTF were encouraged to believe that they could violate the rights of persons such as the Plaintiffs with impunity.

## JURISDICTION AND VENUE

5.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1985 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

7.      Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this complaint occurred in this judicial district.

8.      On or about August 3, 2017, the Plaintiffs provided proper notice of their claim under the Local Government Tort Claims Act.

9.      The amount in controversy exceeds Seventy Five Thousand Dollars ($75,000.00), excluding interests and costs.

## PARTIES

10.     Plaintiff Jeffrey Shore (*hereinafter* "Shore") is a United States citizen presently domiciled in the State of Maryland.

11.     Plaintiff Donna Curry (*hereinafter* "Curry") is a United States citizen presently domiciled in the State of Maryland. Plaintiffs Shore and Curry are husband and wife.

12.    Defendant Jemell Rayam, (*hereinafter* "Rayam") was, at all times relevant to this action, a duly appointed and acting police officer with the BPD and member of an elite police unit called the GTTF. As a police officer he was, at all times herein relevant, acting within the scope of his employment and under color of state law.

13.    Defendant Momodu Bondeva Kenton Gondo (*hereinafter* "Gondo") was, at all times relevant to this action, a duly appointed and acting police officer with the BPD and member of an elite police unit called the GTTF. As a police officer he was, at all times herein relevant, acting within the scope of his employment and under color of state law.

14.    Defendant Baltimore Police Department is a fully operational police department and is designated by law as an agency of the State of Maryland. The BPD is responsible for providing police and law enforcement services for the City of Baltimore and for investigating crimes that occur within the City. The purpose of the BPD also was to protect and preserve life, protect property, understand and serve the needs of the Baltimore City's neighborhoods, and to improve the quality of life in Baltimore City.

15.    Although state law designates the BPD as a state agency, federal courts have long held that the BPD is a suable entity under 42 U.S. § 1983 because the BPD has strong practical links to and was, at all times relevant to this action, acting under the auspices of the MCC. The Mayor appoints the Commissioner of the Police Department with the advice and consent of the City Council. The City Council holds hearings on Police Department policy and sets the Police Department budget.  In sum, the BPD is "so connected with the government of Baltimore City to such an extent as to prevent the Police Department from asserting an Eleventh Amendment immunity."

16.     Defendant the Mayor and City Council of Baltimore City, a municipal corporation was, at all times relevant to this action, a governmental entity within the meaning of the federal and state constitutions.

17.     Defendant Sergeant Thomas Allers, at all times relevant hereto, was employed by Defendant BPD and/or MCC. At all times relevant, Defendant Allers was the supervisory Sergeant of Defendant BPD's Gun Trace Task Force and at all times herein relevant he was acting within the scope of his employment with the BPD and/or MCC.

18.     Defendant Dean Palmere is a former member of the BPD. At all times herein relevant, Palmere was working in the scope of his employment as a police officer with the BPD and/or MCC. Mr. Palmere held various supervisory roles within the BPD in which he oversaw plainclothes units. In 2011, he briefly served as Chief of the Patrol Division before returning in 2012 to his role as Chief of the Criminal Investigations Division. From 2013 until his retirement in 2018, Mr. Palmere served as Deputy Commissioner overseeing the BPD's Patrol and Operations Bureaus, under which the plainclothes units fell. On information and belief, at all relevant times, Mr. Palmere had supervisory responsibility for plainclothes units, was aware of constitutional violations by officers in those units (including Rayam and Allers), and failed to take reasonable steps to stop those violations.

19.     Defendant Major Ian Dombrowski at all times relevant hereto, was employed by Defendant BPD as a Major in Defendant BPDs Internal Affairs Division and at all times herein relevant he was acting within the scope of his employment with the BPD and/or MCC.

20.     Defendants John Does 1-5 were, at all times relevant to this action, duly appointed and acting police officers with the BPD, serving in supervisory positions. As police officers they

were, at all times herein relevant, acting within the scope of their employment and under color of state law.

21.     Defendants John Does 6-10 were, at all times relevant to this action, duly appointed and acting police officers with the BPD. As police officers they were, at all times herein relevant, acting within the scope of their employment and under color of state law.

## FACTUAL ALLEGATIONS

22.     Plaintiffs incorporate herein the preceding allegations of this Complaint.

23.     Defendant, Jemell Rayam joined the Baltimore Police Department ("BPD") on July 12, 2005 and at all times herein relevant was acting within the scope of his employment with the BPD and/or MCC.

24.     The BPD, the MCC, Dombrowski, Palmere and/or other supervisors jointly and severally, had a duty to establish, execute, implement, enforce, direct, supervise and/or control policies, customs, practices, usages, and procedures to be used by police officials of the BPD.

25.     More specifically, the BPD, the MCC, Dombrowski, Palmere and/or other supervisors, jointly and severally, had policymaking authority for the MCC with regard to the creation, staffing, monitoring, supervision, training, and disciplining of the GTTF.

26.     The BPD, the MCC, Dombrowski, Palmere and/or other supervisors, jointly and severally, exercised their policymaking authority by and through formal and informal *ad hoc* decisions regarding the creation, monitoring staffing, supervision, training, and disciplining of the GTTF.

27.     The BPD, the MCC, Dombrowski, Palmere and/or other supervisors, jointly and severally, carried out their policymaking responsibility regarding the GTTF squad with negligence, gross negligence, and/or deliberate indifference to the fact that the GTTF was

engaging in a widespread pattern and practice of unconstitutional conduct against individuals in Baltimore City.

28.     As is set forth in more detail herein, the BPD, the MCC, Dombrowski, Palmere and/or other supervisors, jointly and severally,

(a)     created the GTTF when they knew of should have known elite police units such as the GTTF are likely to commit constitutional violations against individuals in Baltimore City;

(b)     selected, hired, promoted to, and/or retained Rayam, Gondo and Allers in the GTTF, when they knew of should have known that these officers were unfit for the tasks, duties, and responsibilities of a specialized unite and would likely commit constitutional violations against individuals in Baltimore City;

(c)     promoted Allers to a supervisory role in the GTTF when they knew of should have known that Allers could not properly carry out his supervisory duties;

(d)     acquiesced in, tolerated, and failed to adequately correct and remedy the wrongful, improper and unconstitutional acts and/or omissions of Rayam, Gondo and Allers and other members of the GTTF, when they knew or should have that these shortcomings would likely result in the commission of constitutional violations against individuals in Baltimore City;

(e)     failed to properly and adequately supervise, discipline, train or re-train, and/or monitor Rayam, Gondo and Allers and other members of the GTTF, when they knew or should have that these officers would likely engage in the commission of constitutional violations against individuals in Baltimore City; and,

(f)     otherwise maintained, executed, implemented and/or tolerated a persistent and

widespread pattern and/or practice of police misconduct, including but not limited

to the unconstitutional acts and/or omissions of Rayam, Gondo and Allers and

other members of the GTTF described *herein*, such that the persistent and

widespread pattern and/or practice of police misconduct amounted to an unofficial

custom or policy of the GTTF and the BPD to engage in unconstitutional conduct.

29.     As is set forth in more detail herein, the BPD, the MCC, Dombrowski, Palmere and/or

other supervisors, jointly and severally, knew or should have known that Rayam and other

members of the GTTF were engaging in a pattern of unconstitutional, unlawful, improper and

wrongful police misconduct, which misconduct was widespread and pervasive.

30.     The pattern of unconstitutional, unlawful, improper and wrongful police misconduct was

so widespread and pervasive as to constitute a custom or usage with the force of law.

31.     Although the BPD, the MCC, Dombrowski, Palmere and/or other supervisors, jointly and

severally, knew or should have known that this widespread pattern of unconstitutional searches

and seizures, excessive force and false reporting was occurring, Rayam, Gondo and Allers and

other members of the GTTF were not properly monitored, supervised, disciplined or subjected to

retraining.

32.     As a result, Rayam, Gondo and Allers and other members of the GTTF were caused and

encouraged to believe they could commit unjustified, unreasonable and illegal searches, seizures,

excessive force and false reporting, and that such conduct would in fact be tolerated by the BPD,

the MCC, Dombrowski, Palmere and/or other supervisors, to the extent that it has become the de

facto policy and custom of the BPD, the MCC, Dombrowski, Palmere to tolerate such

misconduct by Rayam, Gondo and Allers and other members of the GTTF.

33.     As a result, the BPD, the MCC, Dombrowski, Palmere and/or other supervisors have allowed a police culture to develop within the GTTF in which engaging in wrongful, improper and illegal conduct violative of constitutional rights of individuals in Baltimore City became the normal accepted practice.

34.     There was, at all times herein relevant, an affirmative causal link between the illegal, improper and/or unconstitutional policies, practices, customs and usages of the BPD, the MCC, Dombrowski, Palmere and/or other supervisors, such that these policies, practices, customs and usages rendered the constitutional violations of Rayam, Gondo and Allers and other members of the GTTF reasonably foreseeable and likely to occur.

35.     The GTTF was a specialized unit within the Operational Investigation Division of the BPD. The primary mission of the GTTF was the tracking and tracing of recovered firearms in order to identify and suppress the possession, purchasing, and trafficking of illegal firearms within Baltimore City, and to assist with the investigation and prosecution of firearms-related offenses.

36.     Members of the GTTF normally work in plainclothes, and patrol in unmarked vehicles. The command structure of the GTTF is different from that of other special units in the BPD. Namely, where as other special units, such as flex squads, are supervised by and under the command of each of the nine police districts in the BPD and their commanders, the GTTF was directly overseen centrally by supervisors at police headquarters, including, but not necessarily limited to Dombrowski and Palmere.

37.     The effect of this centralized command structure was to give Rayam and other GTTF members more freedom, and less supervision, to obtain the supposed mission – to remove guns, drugs and violent offenders from the streets of Baltimore so that the city would be a safer place.

38.     The idea of a specialized unit which its officers would have more freedom, and less supervision did not originate with the creation of the GTTF and the MCC, BPD, Dombrowski, Palmere and/or other supervisors knew or should have known that such similar specialized units in the past had resulted in flagrant civil rights violations, including violations in which the member officers stole from and robbed individuals.

39.     Specifically, in 2005, the MCC, BPD and/or other supervisors within the BPD created 2 specialized units called "SET" (Specialized Enforcement Teams). These units ended in disgrace and were disbanded after it was uncovered that the SET units were committing flagrant civil rights violations, including but not limited to entering the residences, stealing from and/or robbing individuals. The activities of the SET unit were widely reported in the press and were known to MCC, BPD and/or other supervisors within the BPD.

40.     Upon information and belief, the SET units created in 2005 are not the only example where a specialized unit, with more freedom and less supervision, devolved into a gang of rogue officers who violated individual's rights on a systematic basis.

41.     Therefore, when the MCC, BPD, Dombrowski, Palmere and/or other supervisors created the GTTF, they knew or should have known (a) that such specialized units often result in civil rights violations; (b) that the GTTF, as created, would likewise likely result in civil rights violations; and (c) that the GTTF would require closer supervision and training in order to avoid civil rights violations.

42.     Upon information a belief, the MCC, BPD, Dombrowski, Palmere and/or other supervisors who created the GTTF were aware that the GTTF members would likely violate individual's civil rights, but would also have success in removing guns, drugs and violent offenders from the streets. Upon information and belief, the MCC, BPD, Dombrowski, Palmere

and/or other supervisors who created the GTTF nevertheless judged that the trade-off (more guns off the streets at the risk of increased civil rights violations) was worth it.

43.     Upon information and belief, the selection process for admitting members into the GTTF was flawed for several reasons, including but not limited to (a) the failure to fully and properly vet the candidates to ensure the they had the requisite honesty and integrity; (b) the failure to fully investigate the background of the candidates; (c) selecting patrol officers with the highest arrest rates without considering that the high arrest rates were achieved but cutting corners on the Fourth Amendment.

44.     Rayam was promoted to the GTTF in 2010, at a time when he was under internal investigation by the BPD.

45.     Defendant Rayam was a member of the GTTF and has since pled guilty to crimes he committed while a member of the GTTF. In his plea agreement, Defendant Rayam admitted, "[W]hile serving as a BPD officer, [he] robbed civilians he detained and in some cases arrested and stole money and drugs from them. [He] did this beginning in at least 2009 or 2010 when he joined the GTTF."

46.     Defendant Rayam further admitted "[T]he purposes of [Rayam and others] included violating the legitimate purposes of the BPD in order to enrich themselves through illegal conduct, including extortion, robbery and time and attendance fraud."

47.     According to the aforementioned plea agreement, Rayam further admitted: Among the means and methods by which Rayam and others pursued their illegal purposes were the following:

    a.      detaining individuals and stealing money, property and narcotics from them;

b.     entering residences and stealing money, property and narcotics from the owners and occupants of those residences;

c.     conducting traffic stops of vehicles and stealing money, property and narcotics from the vehicle occupants;

d.     swearing out false affidavits to obtain search warrants in order to steal money, property and narcotics;

e.     preparing false and fraudulent official incident and arrest reports, reports of property seized from arrestees and charging documents to conceal the fact that Rayam and others stole money, property and narcotics from individuals;

f.     evading court proceedings involving arrestees from whom Rayam and others stole money, property and narcotics in order avoid questioning regarding the stolen money, property and narcotics; and

g.     obstructing and evading law enforcement efforts to uncover their criminal conduct, including,

     i.     alerting one another to potential investigations into their criminal conduct,

     ii.     coaching one another to give false testimony to investigators from the Internal Investigations Division of the BPD,

     iii.     turning off their body cameras to avoid recording law enforcement encounters with civilians in which they were participants; and

h.     defrauding the BPD and the State of Maryland by submitting false and fraudulent time and attendance records in order to obtain salary and overtime payments for times when they did not work.

48.     In the plea agreement, Rayam also admitted, (a) that he sold, through associates of his,
drugs that other GTTF members gave him (after robbing detainees and arrestees) and split the
proceeds of those sales with other GTTF members; (b) that he robbed detainees and arrestees
with another police officer, who was not a member of the GTTF; (c) that he and this other police
officer would falsely represent that they had a search warrant, when they did not, in order to gain
access to someone's home and would then steal money and other things of value; (d) that he
robbed members of the community with other associates who were not police officers; (e) that he
also robbed drug dealers whom an associate of his identified. This associate would tell him when
a drug dealer had a significant amount of cash in their home and when the associate knew the
drug dealer would not be in the home. Rayam would then rob the drug dealer's home with the
assistance of other associates of his who were not police officers.

49.     Rayam also admitted: "At times, he shared the proceeds with [other GTTF members]
including Momodu Gondo, Wayne Jenkins, Daniel Hersl, Marcus Taylor, Sergeant A[llers] and
others, and on other occasions, he kept all of the proceeds for himself. The practice of stealing
from detainees and arrestees is referred to as "taxing" them, a term Rayam himself used when he
robbed S.S. in September 2016 ...."

50.     Rayam committed other acts, going back as far as 2010, that raised questions about his
integrity and honesty and showed, or should have shown, to the BPD and reasonable supervising
officers and internal investigators, that Rayam would not fit for duty, was engaged in criminal
conduct and was likely to continue his pattern of criminal conduct.

51.     One such matter that put the BPD and it agents, servants and/or employees on notice of
Rayam unfitness for duty and criminal propensity is a 2009 incident involving Gary Brown
(*hereinafter*, "the Gary Brown Incident")

52.     In the Gary Brown incident, Mr. Brown alleged that Rayam and other officers conducted a traffic stop and stole approximately $11,000.00 from Mr. Brown. After Mr. Brown made a complaint, an investigation revealed that bank records corroborated his complaint and he passed a polygraph test.

53.     On June 14, 2014, Rayam was ordered by the BPD to take a polygraph and the test showed a greater that 99% chance that he was being deceptive about the Gary Brown incident.

54.     Rayam's failed polygraph test and corroborative bank records should have caused the BPD to terminate Rayam's employment. Nevertheless, the BPD, through a failed internal investigation procedure or other malfeasance or misfeasance, did not terminate Rayam.

55.     Upon information and belief, the Gary Brown incident was not an isolated incident, but rather part a bigger scheme in Rayam and others systematically sought to enrich themselves.

56.     Upon information and belief, the members of Office of the States Attorney for Baltimore City had actual or constructive knowledge that Rayam and other members of the GTTF were engaging in wide-ranging civil rights violations, testifying falsely and preparing false reports.

57.     Upon information and belief, beginning in 2009, Defendant SAO disclosed to criminal defendants and their counsel that members of the GTTF had been caught stealing. Upon information and belief, this information was shared with supervisors and internal investigators of the BPD.

58.     Upon information and belief, at all times herein relevant and prior to June 27, 2014, Defendant Rayam and other members of the GTTF coached one another on how to participate in Internal Investigations interviews and discussed turning off their body cameras, and planned additional robberies. They also alerted one another to investigations of their criminal conduct.

59.     Simply put, at all times during the course of events and prior to June 27, 2014, the MCC, the BPD, Dombrowski, Palmere and/or other supervisors who created, supervised and/or trained Rayam, were on notice that Rayam and other members of the GTTF engaged in illegal acts while in the course of their employment and that these illegal acts included, but were not limited to, planting evidence, stealing money, lying to investigators and writing false reports.

60.     All of the foregoing illustrates that the MCC, the BPD, Dombrowski, Palmere and/or other supervisors who created the GTTF, and supervised and/or trained Rayam knew or should have know that Rayam lacked the integrity and honesty necessary to be a Baltimore police officer as early as June 14, 2010, some 4 years before the Plaintiffs were victimized by Rayam.

61.     Likewise, the MCC, the BPD, Dombrowski, Palmere and/or other supervisors who created the GTTF, and supervised and/or trained Rayam failed to take remedial actions against the widespread unconstitutional and illegal conduct of Rayam and other GTTF police officers.

62.     The MCC, the BPD, Dombrowski, Palmere and/or other supervisors who created, supervised and/or trained Rayam therefore knew that Rayam also should not have been selected to join the GTTF.

63.     Defendant Dombrowski, through his official capacity as a Major in Defendant BPD's Internal Affairs Division, implemented a policy or custom of condonation or deliberate indifference to the unconstitutional and illegal conduct of Rayam and other GTTF officers and had a custom or policy of failing to investigate and discipline Defendant BPD officers adequately.

64.     Defendant Dombrowski failed to adequately investigate and discipline Defendants Rayam and Gondo and other GTTF members.

65.     Defendant Dombrowski's supervisory acts and failures to act are attributable as Defendant BPD's direct acts and failures to act. Defendant Dombrowski was a Major in Defendant BPD's Internal Affairs Division and his acts or failures to act reflected official policy and practice for Defendant BPD or the failure to correctly implement the same.

66.     Defendant Palmere, through his official capacity as Deputy Police Commissioner of Defendant BPD, implemented a policy or custom of condonation or deliberate indifference to the unconstitutional and illegal conduct of Rayam and other GTTF officers and had a custom or policy of failing to train Defendant BPD officers adequately.

67.     Upon information and belief, Defendant Palmere actively coached the officers of the GTTR as to what to testify to in court when confronted with allegations of illegal activity in order to further shield the actions from discovery.

68.     Defendant Palmere failed to adequately supervise Defendant Rayam and other GTTF officers. Defendant Palmere's supervisory acts and failures to act were the direct acts are attributable as Defendant BPD's direct acts and failures to act.

69.     Defendant Palmere was the Deputy Police Commissioner at all times herein relevant and his acts or failures to act reflected official policy and practice for Defendant BPD or the failure to correctly implement the same.

70.     At all times herein relevant, Allers served as the supervisor sergeant in charge of the GTTF. Allers implemented a policy or custom of condonation or deliberate indifference to the unconstitutional and illegal conduct of Rayam and other GTTF officers and had a custom or policy of failing to adequately train of Rayam and other GTTF officers.

71.     Allers not only failed to carry out his supervisory duties properly with regard to the GTTF and Rayam, but also participated with Rayam and other members of the GTTF in violating the rights of individuals within the city of Baltimore.

72.     Allers' supervisory acts and failures to act are attributable as Defendant BPD's direct acts and failures to act. Because Defendant Allers was the GTTF supervisor on June 27, 2014, his acts or failures to act reflected official policy and practice for the BPD or the failure to correctly implement the same.

73.     Allers has since pled guilty in federal court to racketeering conspiracy, admitting he robbed citizens for years and tipped off members of the unit to the investigation of their crimes.

74.     At all times herein relevant, Rayam, Allers, Dombrowski, Palmere, John Does 1-5 (other unknown supervisors within the Baltimore Police Department, and John Does 6-10 (unknown police officers of the Baltimore Police Department) were employed by the MCC and/or BPD and acted within the scope of their employment.

## The Incident Involving the Plaintiffs

75.     On June 27, 2014, at approximately 4:00 p.m., Rayam, Gondo and Allers executed a search and seizure warrant at a store that sold birdseed. No illegal contraband or firearms were found at the location.

76.     The store owners, Plaintiffs Donna Curry and Jeffrey Shore, had $20,000 in cash at the store. This money was lawfully accumulated from sales at their pigeon store, receipt of a federal income tax refund, income from Mr. Shore's secondary business selling junk cars as scrap, and from loans they received so that they could pay their property taxes at the municipal building the following day.

77.     During the search, Rayam, Gondo and/or another officer asked if there were any large amounts of money in the pigeon store. Curry told them that she had $20,000.00 in her purse.

78.     Rayam wanted to steal the money but Gondo did not, fearing that the store owners, who were legitimate business owners, would report the theft to law enforcement.

79.     Deciding not to steal the money from the store, Rayam, Gondo and Allers left the store.

80.     Later that day, Rayam contacted Thomas Finnegan and David Rahim, two associates of his. Finnegan and Rahim (*hereinafter* "the two civilian confederates") were not police officers. Rayam, Finnegan and Rahim agreed that the three of them would rob Curry and Shore at home, where they believed they had returned with the $20,000.

81.     Using a law enforcement database, Rayam located the home of Curry and Shore and later that evening rode Rayam drove to the Curry/Shore home with the two civilian confederates. While outside the home Rayam and two civilian confederates conducted surveillance at the home and waited until it was dark. Rayam and two civilian confederates agreed that the two civilian confederates would conduct a home invasion robbery while pretending to be police officers. Prior thereto, Rayam had given his BPD police tactical vest to one of the confederates to wear and the other confederate procured and wore a similar-looking tactical vest.

82.     Shortly after midnight, now June 28, 2014, the two civilian confederates then entered the Curry/Shore home without lawful permission as they falsely presented themselves as police officers. One of the confederates was armed with a gun when both he and the other confederate entered the residence. One confederate pointed the gun at Shore and told him to sit still and be patient. Curry was also detained under threat of force and intimidation.

83.     During this time, Plaintiff Curry observed one of the confederates enter the kitchen and she heard a great deal of noise, as if he was searching for something. The Plaintiffs observed the man leave the kitchen and tell the other individual, "Let's go, let's go. Today's your lucky day."

84.     Plaintiff Curry glanced into the dining room where she had left her pocketbook and said, "My pocketbook is missing." She went into the kitchen and observed her pocketbook in the sink with the cash missing.

85.     While the two civilian confederates were committing the home invasion robbery, Rayam remained in a car outside the home so that if Curry or Shore called the police, Rayam could intercept the police officers that responded and pretend to be responding to the incident himself.

86.     After the robbery, the confederates left with the money and returned to the vehicle Rayam was driving.

87.     The two civilian confederates split the money with Rayam.

88.     Shore and Curry were badly shaken up by the robbery and promptly reported it to the police. Although the two civilian confederates impersonated police officers, their behavior was so unnatural that Shore and Curry did not believe that any actual police officers were involved in the robbery; rather, they thought they were robbed by two civilians pretending to be police officers.

89.     After their report of the robbery, Shore and Curry periodically followed up with the BPD to get information as to the robbery but did not receive any useful information from the BPD other than that two civilian confederates were not police officers.

90.     May 8, 2017 was the when Shore and Curry learned that a BPD police officer, Rayam, was the robbery mastermind; on that date they were contacted by the FBI, who was investigating Rayam and the other members of the GTTF.

91.     In other words, Rayam, by and through his fraud and deception, kept the claimants from

knowing that he, a Baltimore Police officer and local government employee, had committed acts

against them constituting claims under the Local Government Tort Claims Act and concomitant

federal civil rights violations.

## CAUSES OF ACTION

### COUNT 1 (VIOLATION OF 42 U.S.C. § 1983 – FOURTH and FOURTEENTH AMENDMENTS – AGAINST DEFENDANT RAYAM, ALLERS AND GONDO – DIRECT LIABILITY)

92.     Plaintiffs incorporate herein the preceding allegations of this Complaint.

93.     This Count is brought by the Plaintiffs against the BPD, the Rayam, Allers and Gondo,

jointly and severally.

94.     At all times relevant herein, Rayam, Allers and Gondo were state actors and "persons"

within the meaning of 42 U.S.C. § 1983 and their conduct was and is subject to 42 U.S.C. §

1983.

95.     At all relevant times herein, Plaintiffs had rights under the Fourth and Fourteenth

Amendments not to have their persons or property unlawfully searched, seized, detained in an

unreasonable manner, not to be deprived of their liberty without due process of law, and not to

be summarily punished.

96.     Rayam, Allers and Gondo, acting under the color of law, jointly and severally, deprived

Plaintiffs of their clearly established and well-settled rights under the Fourth and Fourteenth

Amendments of the U.S. Constitution not to have their persons or property unlawfully searched,

seized, detained in an unreasonable manner, not to be deprived of their liberty without due

process of law and not to be summarily punished. Specifically, Rayam, Allers and Gondo

conspired to orchestrate a home invasion robbery of the Plaintiffs for the purpose of stealing

money from the Plaintiffs and Rayam, along with two civilian confederates, participated in home invasion robbery of the Plaintiffs for the purpose of stealing money from the Plaintiffs.

97.     It is clearly established now and was clearly established at the time of their actions that the conduct of Rayam, Allers and Gondo violated the Fourth and Fourteenth Amendments to the U.S. Constitution.

98.     Rayam, Allers and Gondo, jointly and severally, subjected the Plaintiffs to these deprivations of their rights maliciously and/or by acting with reckless disregard for or deliberate indifference to whether the Plaintiffs' rights would be violated by their actions.

99.     As a result of the aforementioned federal Constitutional violations, the Plaintiffs sustained economic and non-economic damages, including, but not limited to, loss of liberty, pain and suffering, and severe emotional distress.

<u>COUNT 2 (VIOLATION OF 42 U.S.C. § 1983 – FOURTH and FOURTEENTH AMENDMENTS – AGAINST DEFENDANTS THE BPD, AND THE MCC FOR M*ONELL* LIABILITY</u>

100.    Plaintiffs incorporate herein the preceding allegations of this Complaint.

101.    This Count is brought by all of the Plaintiffs against the BPD AND the MCC, jointly and severally.

102.    At all times relevant herein, the BPD and the MCC, were state actors and "persons" within the meaning of 42 U.S.C. § 1983 and their conduct was and is subject to 42 U.S.C. § 1983.

103.    At all relevant times herein, Plaintiffs had rights under the Fourth and Fourteenth Amendments not to have their persons or property unlawfully searched, seized, detained in an unreasonable manner, not to be deprived of their liberty without due process of law, and not to be summarily punished.

104.     The BPD and the MCC, acting under the color of law, jointly and severally, deprived Plaintiffs of their clearly established and well-settled rights under the Fourth and Fourteenth Amendments of the U.S. Constitution not to have their persons or property unlawfully searched, seized, detained in an unreasonable manner, not to be deprived of their liberty without due process of law, and not to be summarily punished.

105.     By establishing, executing, implementing, enforcing, directing, supervising and/or controlling policies, customs, practices, usages, and procedures to be used by police officials of the BPD regarding the GTTF, as is set forth *supra*, the BPD, the MCC, acting under the color of law, jointly and severally, caused the Plaintiffs to be deprived of their clearly established and well-settled rights under the Fourth and Fourteenth Amendments of the U.S. Constitution not to have their persons or property unlawfully searched, seized, detained in an unreasonable manner, not to be deprived of their liberty without due process of law, and not to be summarily punished.

106.     It is clearly established now and was clearly established at the time of their actions that the conduct, patterns and practices of the BPD and the MCC violated the Fourth and Fourteenth Amendments to the U.S. Constitution.

107.     The BPD and the MCC subjected the Plaintiffs to these deprivations of their rights maliciously and/or by acting with reckless disregard for or deliberate indifference to whether the Plaintiffs' rights would be violated by their actions.

108.     As a proximate result of the conduct of the BPD and the MCC, the Plaintiffs sustained economic and non-economic damages, including, but not limited to, loss of liberty, pain and suffering, and severe emotional distress.

<u>COUNT 3 (VIOLATION OF 42 U.S.C. § 1983 – FOURTH and FOURTEENTH AMENDMENTS –AGAINST DEFENDANTS DOMBROWSKI, PALMERE, ALLERS, AND OTHER UNKNOWN SUPERVISORS – SUPERVISOR LIABILITY)</u>

109.    Plaintiffs incorporate herein the preceding allegations of this Complaint.

110.    This Count is brought by all of the Plaintiffs against Dombrowski, Palmere, Allers and/or other Unknown Supervisors (John Does 1-5), jointly and severally.

111.    At all times relevant herein, Dombrowski, Palmere, Allers and/or other Unknown Supervisors (John Does 1-5) were state actors and "persons" within the meaning of 42 U.S.C. § 1983 and their conduct was subject to 42 U.S.C. § 1983.

112.    At all relevant times herein, Plaintiffs had rights under the Fourth and Fourteenth Amendments not to have their persons or property unlawfully searched, seized, detained in an unreasonable manner, not to be deprived of their liberty without due process of law, and not to be summarily punished.

113.    By failing to take proper supervisory action, Dombrowski, Palmere, Allers and/or other Unknown Supervisors (John Does 1-5), acting under the color of law, jointly and severally, caused the deprivation of the Plaintiffs of their clearly established and well-settled rights under the Fourth and Fourteenth Amendments of the U.S. Constitution not to have their persons or property unlawfully searched, seized, detained in an unreasonable manner, not to be deprived of their liberty without due process of law, and not to be summarily punished.

114.    It is clearly established now and was clearly established at the time of their actions that the conduct, patterns and practices of the Defendants violated the Fourth and Fourteenth Amendments to the U.S. Constitution.

115.    Dombrowski, Palmere, Allers and/or other Unknown Supervisors (John Does 1-5) subjected the Plaintiffs to these deprivations of their rights maliciously and/or by acting with reckless disregard for or deliberate indifference to whether the Plaintiffs' rights would be violated by their actions.

116.     As a result of the aforementioned federal Constitutional violations, the Plaintiffs

sustained economic and non-economic damages, including, but not limited to, loss of liberty,

pain and suffering, and severe emotional distress.

<u>COUNT 4 (VIOLATION OF THE MARYLAND DECLARATION OF RIGHTS)</u>

117.     Plaintiffs incorporate herein the preceding allegations of this Complaint.

118.     This Count is brought by the Plaintiffs against all of the Defendants, jointly and severally.

119.     The Defendants, by arresting, seizing, searching, falsely imprisoning, stealing from and

committing other unconstitutional and tortuous acts against the Plaintiffs, violated and deprived

them of rights guaranteed to them under the Maryland Declaration of Rights, including, *inter*

*alia*, Articles 24 and 26.

120.     As a proximate result of the Defendants' conduct in violation of the Maryland

Declaration of Rights, the Plaintiffs sustained economic and non-economic damages, including,

but not limited to, loss of liberty, pain and suffering, and severe emotional distress.

<u>COUNT 5 (FALSE ARREST – AGAINST DEFENDANT RAYAM)</u>

121.     Plaintiffs incorporate herein the preceding allegations of this Complaint.

122.     This Count is brought by the Plaintiffs against Rayam.

123.     The intentional and malicious acts of Defendant Rayam caused the Plaintiffs to be

unlawfully arrested, restrained, detained and/or confined, thereby depriving them of their

freedom of movement, without his consent and without legal justification.

124.     As a result of the intentional and malicious conduct of Defendant Rayam, the Plaintiffs

suffered substantial damages, including, but not limited to, serious, painful, and permanent

injury, mental anguish, humiliation, monetary losses, and other damages.

## COUNT 6 (FALSE IMPRISONMENT – AGAINST DEFENDANT RAYAM)

125.    Plaintiffs incorporate herein the preceding allegations of this Complaint.

126.    This Count is brought by the Plaintiffs against Rayam.

127.    The intentional and malicious acts of Defendant Rayam caused Plaintiff to be confined

and/or deprived of their personal liberty, by force or threat of force, without their consent and

without legal justification.

128.    Plaintiffs were conscious of the fact that he was being confined and/or deprived of their

liberty.

129.    As a result of the intentional and malicious conduct of Defendant Rayam, the Plaintiff

suffered substantial damages, including, but not limited to, serious, painful, and permanent

injury, mental anguish, humiliation, monetary losses, and other damages.

## COUNT 7 (CIVIL CONSPIRACY – AGAINST DEFENDANTS RAYAM, GONDO AND ALLERS)

130. Plaintiffs incorporate herein the preceding allegations of this Complaint.

131.    This Count is brought by the Plaintiffs against Rayam, Gondo and Allers.

132.    Prior to the home invasion robbery of the Plaintiffs, Defendants Rayam, Gondo and

Allers, acting within the scope of their employment and under color of law, agreed among

themselves and with other individuals to act in concert to deprive Plaintiffs of their rights under

the Maryland Declaration of Rights and to commit tortious acts against the Plaintiff, including,

but not necessarily limited to false arrest and false imprisonment.

133.    Accordingly, Defendants, acting in concert, conspired to accomplish an unlawful

purpose by unlawful means.

134.    In furtherance of this conspiracy, Defendants engaged in and facilitated numerous

unlawful acts, including, but not limited to, planning and/or participating in the home invasion robbery, and were otherwise willful participants in the joint activity.

135.    The misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

136.    As a direct and proximate result of Defendants' illicit prior agreement and actions in furtherance of the conspiracy discussed above, Plaintiffs suffered injuries, including but not limited to loss of liberty, physical injury, and severe emotional distress.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court:

a.    Award the Plaintiffs actual, compensatory, and consequential damages, in an amount to be determined at trial, against all Defendants jointly and severally;

b.    Award Plaintiff punitive damages, in an amount to be determined at trial, against the Defendants;

c.    Award Plaintiff reasonable attorney's fees and costs, incurred in pursuing this action, as provided under 42 U.S.C. §1988, and;

d.    Award such other and further relief as this Court may deem appropriate.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

RESPECTFULLY SUBMITTED, this 7th day of May 2019.

Matthew E. Bennett
**Federal Bar Number 24768**
8720 Georgia Avenue; Suite 701

Silver Spring, Maryland 20910
Ph:   (301) 587 – 3942
Fax:   (301) 589 – 1585
Email: matthew@mbennettlaw.com


And

_____
Marc Zazon
Federal Bar Number 26330
201 N Charles Street, Suite 1700
Baltimore, MD 21201
Ph:   (410) 727 – 3710
Fax:   (410) 727 – 4955
Email: mzayon@walkerzayon.com


ATTORNEYS FOR PLAINTIFFS